KNOLL, Judge.
Mid-Continent Aggregate, Inc. (MCA) filed suit for reimbursement of four checks totaling $10,690.26, issued by Hank H. Brandt while he was president of MCA. Brandt reconvened for reimbursement of costs he advanced MCA. The trial court held: that the debts Brandt paid with corporate funds were not debts of MCA, nor were they justified, authorized or in furtherance of MCA business; and, dismissed Brandt’s reconventional demand with prejudice. Brandt appeals contending the trial court erred in holding him liable to MCA for the four checks totaling $10,690.26, and in denying him reimbursement for costs of MCA he advanced.
The issues presented for our consideration concern factual determinations by the trial court. Since we have been favored by the learned trial court’s well considered written reasons for judgment which we find the record supports, we adopt and incorporate herein its reasons for judgment as our opinion, which states:

“Mid-Continental Aggregate, Inc. has filed suit seeking to recover from Hank Brandt, its former president, the amounts of four specific checks allegedly improperly issued during the defendant’s term of office.

The plaintiff corporation, which was referred to as MCA for purposes of brevity during the trial, was organized April 16, 1981. Its shareholders were Dr. R.J. Bono, Dr. J.W. Digilia and Hank Brandt. These same persons were also directors of the corporation. The initial report lists three other names as directors but these were not known to the incorporators, seen once only by Hank Brandt and took no part in any of the activities of the corporation. They were never treated or considered as directors and it was not made clear why their names were included in the initial report. Three stock certificates were issued, each for 200 shares, to the shareholders just named. Drs. Bono and Digilia paid $10,000 each for their shares. Mr. Brandt paid nothing. The two directors testified that Mr. Brandt was to also pay for his shares. Mr. Brandt stated he was told by Harry Tubbs that he need not pay but would get his shares for serving as president. More about Harry Tubbs later.

The principal purpose of the corporation was to sell rock ‘aggregate’ for road building and construction purposes. During its entire existence it effected one sale only, making a profit of less than $4,000 on a sale of over $114,000. The aggregate was purchased from Weaver Aggregate and Coal Co., Inc. of Jacksonville, Arkansas and resold to Burton Industries. The transaction was financed through a letter of credit for $700,000 secured from Calca-sieu Marine National Bank by Drs. Bono and Digilia.

Hank Brandt was made president at the inception of the business, April 16, 1981, and resigned the latter part of August, 1981 at the request of Dr. Bono. During his tenure he issued several checks drawn on corporate funds including the four at issue here, namely

(1) Dated June 4, 1981 to Downtown-er $617.25 (PL-9)

(2) Dated June 11, 1981 to Down-towner $651.60 (PL-10)

(3) Dated June 22, 1981 to Central Flying Service $4,421.41 (PL-11)

(4) Dated August 3, 1981 to Jose Roberto Larios $5,000.00 (PL-12)

The first check (PL-9) is attached to a series of bills from the Downtowner Motor Inn listing as a guest L.D. Baker of Jacksonville, Arkansas. The top sheet recites ‘Hold!!! Harry Tubbs will come by and pay’. One or more sheets have notations ‘Bill to Harry Tubbs’. Mr. Brandt explains that Mr. Baker was an associate of John Weaver and that Harry Tubbs told him to pay the bill out of MCA funds.

*1119
The second check for $651.60 also paid a bill at the Downtowner, this time for room and services to Harry Tubbs and Roberto Larios. The explanation of the defendant is that Mr. Tubbs and Mr. Larios were negotiating for the purchase of a rock quarry in Arkansas and planned to sell its production to MCA.

The defendant stated in many instances he relied on information and instructions from Harry Tubbs (now deceased) in paying bills and taking other actions. However he knew or should have known that Mr. Tubbs was not an officer, director or shareholder of the corporation. This information was available in the corporate records, including the stock certificate book, in his possession. The evidence available to the Court does not indicate that Mr. Tubbs was otherwise authorized to act or speak for the corporation. Accordingly the acts of the defendant in disbursing funds, must establish, standing alone, that they were proper corporate disbursements.

The third item at issue is a disbursement of $4,42141 made to Central Flying Service for a 100 hour inspection made on an airplane owned by defendant or by his corporation Betts Air, Inc. Mr. Brandt seeks to justify this as a proper expense by claiming it was in partial re-imbursement for airplane charter charges properly chargeable to MCA. He submits in support of this claim a list of charter flights made on his aircraft (D-10). It is noted however that the questioned payment was made on June 22, 1981 (PL-11) and comparing this with the list of claimed charter flights (D-10) reveals that when the payment was made only three of the flights had taken place and the remainder occurred on later dates. Even accepting the argument of defendant as correct, the claimed offset did not exist at the time the payment was made to Central Flying Service.

Most of the claimed charter flights were made at the request of or on the instruction of Harry Tubbs. Elsewhere in this opinion it is pointed out that Mr. Tubbs had no authority to give these instructions or make these requests on behalf of MCA.

Last on the list is a check issued to Jose Roberto Larios [from El Salvador, Central America] for $5,000 on August 3, 1981. This was a loan, never repaid and Mr. Larios is now reportedly out of the country. Mr. Larios asked Mr. Brandt for a loan. Due to the fact that he had helped with funds when Hank Brandt purchased an airplane. Mr. Brandt decided to make the loan and issued a check drawn on his company, Betts Air, Inc. It was refused by the bank due to insufficient funds and Mr. Brandt then issued the instant check on MCA. The defendant contends that Drs. Bono and Digilia later, after he left the company, and on September 16, 1981, loaned Roberto Larios $2,000. It may well be that the corporation is also authorized to recover this $2,000 from Dr. Bono and Dr. Digilia, its sole remaining shareholders. But this does not alter any right that MCA may have to recover from a former officer an amount improperly loaned to another out of corporate funds.

In his capacity as president the defendant was authorized to sign checks and disburse corporate funds. But he was also bound to restrict his disbursements to the satisfaction of actual corporate obligations. He was in a fiduciary capacity and was responsible for his acts. Whenever he acted irresponsibly his acts were beyond his legitimate authority as an officer of the corporation and he is answerable for such acts. The debts which the defendant paid with corporate funds were not debts of MCA. Nor has it been established that these payments were justified or authorized as being related to and in furtherance of the business of plaintiff.”

In the absence of abuse of the trial court’s wide discretion of factual determinations, we cannot disturb its factual *1120 findings. Canter v. Koehring, 283 So.2d 716 (La.1973); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). We have carefully reviewed the record and find the trial court’s factual determinations are well supported. Therefore, we conclude that the trial court did not err in awarding MCA reimbursement from Brandt in the sum of $10,690.21.
Likewise, we find the record does not support Brandt’s claim for reimbursement of costs he advanced MCA. Therefore, the trial court properly dismissed Brandt’s re-conventional demand with prejudice.
For the foregoing reasons, the judgment of the trial court is affirmed. All costs of this appeal are assessed to defendant-appellant.
AFFIRMED.